UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DENNIS GARGAS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:09-CV-2078 (CEJ) |
| ) | |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On January 22, 2008, plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., §§ 1381 et seq., and an application for supplemental security income disability benefits under Title XVI of the Act, 42 U.S.C. §§ 1391 et seq. (Tr. 13-15). Plaintiff claimed disability due to back, knee and mental problems with an onset date of November 12, 2007. Id. The applications were initially denied by defendant on March 18, 2008. Id. Plaintiff requested a hearing, which was held before an Administrative Law Judge (ALJ) on April 23, 2008. Id. Plaintiff testified at the hearing and testimony was given by a vocational expert. Id.

On January 30, 2009, the ALJ found that plaintiff was not disabled and denied his claims for benefits. (Tr. 10-21). Plaintiff requested review of the ALJ's decision by the Appeals Council. (Tr. 7-8). On October 16, 2009, the Appeals Council denied

plaintiff's request. (Tr. 1-3). Therefore, the ALJ's determination denying plaintiff benefits stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

Plaintiff has filed three separate applications for social security disability benefits. (Tr. 105, 116; Doc. # 28-1). Under review here is plaintiff's second application filed on January 22, 2008. (Tr. 10-21). The first application, filed on September 5, 2006, was denied, and plaintiff returned to work shortly thereafter. (Tr. 105). Plaintiff filed a third application for disability benefits on March 25, 2009, alleging the same onset date as alleged in his second application, November 12, 2007. (Doc. #28-1). With respect to the third application, an ALJ issued a decision on September 22, 2010 finding that plaintiff was disabled, but ruling that this Court had exclusive jurisdiction over plaintiff's disability claim for the period beginning November 12, 2007 to January 30, 2009. Id. Thus, the ALJ found that plaintiff was disabled beginning January 31, 2009, the day after the decision that is presently under review here. Id. This decision has not been challenged by defendant and so the only issue before the Court is whether plaintiff was wrongly denied benefits for the period from November 12, 2007 to January 30, 2009.

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 48 years old. He had completed high school and he had attended junior college studying criminal justice for two years and building maintenance for two years. He did not obtain a degree or certificate with respect to his post-secondary education. (Tr. 25-26). Plaintiff was not married and he lived alone. (Tr. 26).

A. Employment History

Plaintiff was employed as a machine operator and general laborer at a fiberglass fabrication plant from 1993 to 2001. His employment ended when the company closed its Missouri facilities and relocated to Texas. From 2001 to 2003, plaintiff worked at Wal-Mart receiving and unloading inventory. In 2002 and 2003, plaintiff also worked part-time at a company where he operated grinding machinery. In 2004 and 2005 plaintiff did not work; he stated that he stayed home to care for his parents who were both ill. After his mother died, plaintiff worked at a country club as a groundskeeper from June until August of 2006. Plaintiff worked as a machine operator at a brake shoe fabrication plant from April to November of 2007 when he was laid off; he returned to work in February 2008. After three days of work, plaintiff injured his back and was admitted to the emergency room. He has not worked since then.

B.  Medical Evidence

The medical record begins with examinations in connection with plaintiff's application for Medicaid in late 2007. (Tr. 236-44). Plaintiff was examined by Stanley London, M.D. on September 20, 2007. (Tr. 239-41). Plaintiff reported that his right knee problems originated from an work-related lifting injury in 2000 and his back problems began with a 2005 injury that occurred when plaintiff was lifting his ill mother. (Tr. 239). Although plaintiff complained of back pain, he stated that it was not constant and that he was able to sit or stand for eight hours at a time and that he was working 40 hours per week in a factory. Id. Dr. London found plaintiff's knee to be stable, with good range of motion and no fluid, but he noted "questionable meniscal damage with history of locking." (Tr. 240). The report also noted that plaintiff limped and had some difficulty moving, but he did not use a cane or other ambulatory device. Id. Dr. London ordered an x-ray of plaintiff's back, as that was his main area of

complaint. Id. The radiological report x-rays taken on September 20, 2007, revealed that there were no fractures and that the intervertebral disc spaces were preserved. However, a large anterior osteophyte[1] along the superior border of the 5th lumbar vertebral body was noted. (Tr. 242). The report found no other significant abnormalities. Id.

Plaintiff was examined on December 12, 2007 by Karen A. MacDonald, Psy.D., a licensed clinical psychologist. (Tr. 236). Dr. MacDonald performed a clinical psychological evaluation in connection with plaintiff's application for Medicaid. Id. Dr. MacDonald reported that plaintiff was suffering from a depressed mood, that his affective responses were flat, but that his mental processes were otherwise adequate and without significant abnormalities. (Tr. 237). Dr. MacDonald concluded that plaintiff suffered from Major Depressive Disorder, Schizoid Personality Disorder and assigned a Global Assessment of Functioning (GAF)[2] score of 50, indicating serious symptoms. (Tr. 238).

Plaintiff was went to the emergency room at Saint Joseph Hospital on February 18, 2007. (Tr. 267-76). He reported that he'd injured his back at work while "pulling" brake pads, and complained of severe lower back pain radiating down his right leg. Id. X-rays were taken of plaintiff back which showed that "alignment is normal. There is no fracture. There is no anterolisthesis." (Tr. 274). He was diagnosed with a lower

---

[1]Also known as a bone spur.

[2]A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.

back strain, prescribed Vicodin[3] and Flexeril[4], and released.  Id.  The admission records indicate that plaintiff smoked a pack of cigarettes per day and had done so for the last 31 years.  (Tr. 267).

Following his release from the emergency room, plaintiff was seen by Gary Rucker, D.O., on March 7, 2008.  (Tr. 257).  This examination was also in connection with a disability determination based upon plaintiff's back injury, right knee pain, his fingers "locking up" and depression.  (Tr. 257-58).  Based on his observations of plaintiff during the examination while crossing the parking lot, Dr. Rucker noted that plaintiff's movement was very slow with an obvious limp.  Id.  He diagnoses included strains of the back and right knee, multilevel degenerative disc disease of the lumbar spine, chronic myositis and spasm, osteoarthritis of medial and anterior compartments, suspected cartilage injury in the knee, and abnormal contracture of the fingers due to possible joint arthritis and/or early Dupytrens contracture.  Id.  These diagnoses were based on the x-rays and MRIs of plaintiff's back and right knee and the March 7, 2008 examination.  Id.

Plaintiff underwent an MRI of the lumbar spine on March 3, 2008.  (Tr. 285).  The MRI report states that plaintiff had mild multilevel degenerative disc disease, but no other significant abnormalities.  Id.

Plaintiff continued to attend regular appointments with Dr. Rucker approximately once a month from March to August of 2008.  (Tr. 279-85).  Dr. Rucker's reports from these examinations detail basically the same conditions noted in his initial report.  Id.  During this time period Dr. Rucker noted that plaintiff was taking prescriptions for

---

[3]Pain medication.

[4]Muscle relaxant.

Cymbalta for depression and that he was continuing to take Flexeril and Vicodin. The reports also note that plaintiff's limp was "slight" on April 15, 2008, but that plaintiff had trouble mowing his lawn and used a cane as of August 15, 2008. (Tr. 279, 283). The final entry in the record from Dr. Rucker is a letter dated November 21, 2008 to plaintiff's counsel. (Tr. 305). This letter summarizes plaintiff's continuing treatment by Dr. Rucker. Id. The letter states that Dr. Rucker attempted to get plaintiff into physical therapy following his March 25, 2008 visit, but that plaintiff's Medicaid coverage did not cover adult physical therapy. Id. In the letter, Dr. Rucker opined that plaintiff had significant degenerative joint disease in his back, osteoarthritis in his right knee with possible cartilage involvement, as well as, contracture or tendon problems in his fingers. Id. Dr. Rucker expressed his belief that plaintiff needed more definitive and specialist care, but noted that plaintiff lacked insurance coverage for this care. Id. The letter states that plaintiff's most recent appointment was October 31, 2008. Id.

In April 2008, plaintiff began seeing Kim A. Dempsey, Psy. D. (Tr. 287). The record shows that plaintiff attended periodic individual sessions with Dr. Dempsey between April and October of 2008. (Tr. 287-303). The reports generated by Dr. Dempsey indicate that plaintiff suffers from "Major Depressive Disorder, Severe Without Psychotic symptoms." Id. She also noted that plaintiff "does not appear to be someone who would handle vocational stress well at this time." (Tr. 287). Dr. Dempsey's reports also assign a GAF score between 48 and 58, although the three more recent reports from October indicate a GAF score of 52-55. Id. Dr. Dempsey's October 9, 2008 report indicates that plaintiff's prescribed dosage of Cymbalta was increased to 60 mg. Id.

### C. Plaintiff's Testimony

Plaintiff testified extensively about his impairments at the November 25, 2008 hearing. (Tr. 22-55). Plaintiff described his typical day as waking up around 9:00 or 10:00 in the morning and then spending the day "sitting in my chair or laying down." His daily activities included watching television and occasionally reading. He indicated that he prepares his own food if it's something easy or microwavable. He was able to dress and feed himself, and he showered "[m]aybe once a week, maybe once a month, whenever I feel like it." (Tr. 42). He testified that he can only stand for 10 minutes at a time before having to sit down and can sit for about 3 hours before he has to get up or lie down. Plaintiff stated that the heaviest item he was able to lift was a gallon of milk, that he uses a motorized cart when he goes grocery shopping once a month, and that he also drives to a convenience store two blocks away if he needs anything else. Plaintiff testified that his siblings do much of his household work, including cleaning and yard work. He stated that he does not have any friends and did not belong to any religious or community groups. He did not have any hobbies, but he used to enjoy woodworking and helping his mother in the garden.

Plaintiff testified that took Vicodin and Flexeril daily and that they make him drowsy for a few hours. He also took Cymbalta which helped to keep him "focused." (Tr. 32). Beginning in December 2007, plaintiff stated that he began using a cane help himself get around and prevent falls, but the cane was not prescribed by a doctor. Plaintiff stated that he cannot stand or walk without his cane and that he is only able to walk 25 or 30 feet before resting. He also stated that the ring finger on his right hand and the middle finger on his left hand contract and "lock up" when he attempts to grasp small items. (Tr. 39). Plaintiff testified that he rejected Dr. Rucker's

recommendation that he get cortisone injections because he didn't like needles and because several people had told him the shots would worsen his pain. Regarding his mental issues, plaintiff testified that he was seeing Dr. Dempsey on a bi-weekly basis, but that his prescription f+or Cymbalta is written by Dr. Rucker. Plaintiff stated that he has trouble being around other people, that he feels anger and hatred and just wants to "get violent and start slapping everybody." (Tr. 41).

### D. Vocational Expert Testimony

At the November 25, 2008 hearing, the ALJ also heard testimony from Brenda G. Young, a vocational consultant. Ms. Young testified that plaintiff's limitations would prevent him from performing any of his past work. (Tr. 50). The ALJ asked Ms. Young about jobs that could be performed by an individual of plaintiff's age, education and work experience, and with the following limitations: a 10-pound maximum weight lift limitation; the ability to stand or walk at least two hours and to sit for six hours in an eight-hour workday; inability to climb ladders, ropes and scaffolds; ability to occasionally climb, stoop, balance, kneel, crouch, and crawl; the need to avoid concentrated exposure to vibration and extreme cold; inability to work at unprotected dangerous heights and around unprotected dangerous machinery; and inability to work in close interaction with the public or other co-workers. Ms. Young testified that there were approximately 3,000 light sedentary assembly or inspection jobs in the St. Louis area that such an individual could perform. (Tr. 51). However, Ms. Young also testified that performing these jobs would require "good dexterity." Id.

### IV. The ALJ's Decision

In the decision issued on January 30, 2009, the ALJ made the following findings:

1. Plaintiff met the insured status requirements of the Social Security Act through June 30, 2009.

2. Plaintiff had not engaged in substantial gainful activity since November 12, 2007, the alleged onset date.

3. Plaintiff has the following severe impairments: discogenic and degenerative disorders of the back and osteoarthritis and allied disorders.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except that he can only occasionally climb ramps or stairs or balance or stoop or kneel or crouch or crawl and can never climb ladders or ropes or scaffolds and must avoid concentrated exposure to extreme cold or vibration or heights or hazards or machinery.

6. Plaintiff is unable to perform any past relevant work.

7. That plaintiff was born on March 6, 1960 and was 47 years old, which is defined as a younger individual age 45-49 on the alleged onset date.

8. Plaintiff has at least a high school education and is able to communicate in English.

. . . .

10. Considering plaintiff's age, education, work experience, and residual function capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. Plaintiff has not been under a disability, as defined in the Social Security Act, from November 12, 2007 through the date of this decision.

(Tr. 13-21).

## V. Discussion

To be eligible for disability insurance benefits, a claimant must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). A claimant will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." <u>Nimick v. Secretary of Health and Human Serv.</u> 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (2002); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987).

A.  <u>Standard of Review</u>

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. the ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by

substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

B.  Analysis

Plaintiff alleges the following errors in the ALJ's determination of Residual Functioning Capacity (RFC): (1) failed to give proper weight to medical opinion evidence and relied on factual and/or logical errors in his analysis; (2) failed to consider limitations arising from plaintiff's hand/finger impairments; (3) failed to include limitations arising from plaintiff's mental impairments and/or committed factual or logic errors in considering plaintiff's mental impairments.

A claimant's RFC is what he can do despite his limitations. 20 C.F.R. § 404.1545(a)(1). Further, a claimant's RFC is a medical question. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir.2001). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. Id. The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.' " Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir.2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir.2000)).

1.  **Failure to Give Proper Weight to Plaintiff's Treating Physician**

Plaintiff first argues that the ALJ did not accord proper weight to medical opinions of his treating physician, Dr. Rucker. Specifically, plaintiff claims that the ALJ accorded greater weight to consulting physician Dr. London, mis-characterized elements of Dr. Rucker's records, failed to adequately address Dr. Rucker's diagnoses including his need of a cane to walk and his right knee instability. Further, plaintiff alleges that the ALJ erred in taking into account plaintiff's conservative course of treatment because more aggressive treatment options were precluded by plaintiff's insurance and financial situation. After a careful review of the record, the Court finds that the ALJ correctly analyzed the available evidence, that his decision is supported by substantial evidence in the record and that plaintiff's alleged errors are without merit.

Generally, the opinion of a treating physician is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other sustainable evidence in the record. 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Further, a treating physician's opinion is given deference over those of consulting physicians. Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992); Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir.1991). Here, the ALJ correctly applied these general rules in determining the plaintiff's RFC and framing hypotheticals in eliciting testimony from vocational expert Brenda Young.

Plaintiff makes a general allegation that the ALJ rejected important elements of Dr. Rucker's medical opinion in favor of the opinion from Dr. London, a consulting physician who only examined plaintiff once two months prior to the alleged onset date. But plaintiff does not cite to any specific rejection of Dr. Rucker's diagnosis and the Court cannot find any specific diagnosis in which the two physicians are in substantial

conflict. Further, the record shows that the limitations used in determining plaintiff's RFC are entirely consistent with Dr. Rucker's and Dr. London's medical reports, as well as with plaintiff's own testimony from the November 25, 2008 hearing.

Plaintiff claims that the ALJ erred because he described plaintiff's degenerative disc disease as "mild." (Tr. 19). He states that this is inconsistent with reports that diagnose plaintiff disc disease as "multilevel." (Tr. 285). But the terms "multilevel" and "mild" are not mutually exclusive or inconsistent. Further, the record shows that plaintiffs disc disease was often referred to as "mild multilevel degenerative disc disease" by both examining physicians, as well as by the radiologists who examined plaintiff's back x-rays and MRI. Id. Plaintiff also states that the ALJ's remark that there was no instability in plaintiff right knee is inconsistent with Dr. Rucker's findings. However, plaintiff's knee was found to be stable by Dr. Rucker (Tr. 259) and by Dr. London (Tr. 240), and even a finding of instability is not indicative of greater limitation than the ALJ used in determining RFC.

Next, plaintiff claims that the ALJ failed to acknowledge several clinical findings made by Dr. Rucker. He states that the ALJ did not address "tenderness" in plaintiff's back, plaintiff's limp, and his need of a cane for sustained ambulation. Again, the ALJ addressed plaintiff's pain and his limited mobility in determining RFC. It is clear that even if the ALJ did not mention these specific conditions, he took them into account in framing the hypotheticals presented to the vocational expert. Further, Dr. Rucker did not opine that any additional limitations than those considered by the ALJ would be necessary as a result of these conditions. Thus, the ALJ's treatment of plaintiff's limitations in these areas is consistent with the medical documentation presented by plaintiff as well as the record as a whole.

### 2. Failure to Consider Abnormal Finger Contracture Limitations.

The next error plaintiff alleges arises from the ALJs failure to include limitations from plaintiff's finger contracture problem in his hypothetical or ignoring the vocational expert's testimony that the sedentary work available to plaintiff would require good dexterity. However, the ALJ's determination that plaintiff's limitations in this category were not so great as to preclude the type of work described by the vocational expert is substantially supported by the record and not contrary to any medical opinion offered by plaintiff. The ALJ properly considered that, while plaintiff had some problems with this 4th and sometimes 3rd fingers involuntarily contracting or "locking up," he would be able to exhibit enough dexterity to function in a sedentary assembly, inspection, or sorting type job. (Tr. 19). Although Dr. Rucker noted plaintiff's condition in his reports he did not identify any restrictions that resulted from plaintiff's finger impairment. In the absence of any medical opinions on the issue, the ALJ properly considered plaintiff's testimony that he was able to dress and feed himself, cook simple meals, and grip or grasp items in finding that the finger impairment was not so great as to prevent plaintiff from performing sedentary work. As such, the ALJ's decision was supported by substantial evidence in the record and the finding that plaintiff had sufficient dexterity to perform the jobs described by the vocational expert is not reversible error.

### 3. Limitations Arising From Plaintiff's Mental State Insufficient

Finally, plaintiff argues that the ALJ did not take into account his mental issues in determining RFC. This claim is clearly refuted by the record. The ALJ specifically included a limitation specifying that plaintiff could have limited and only superficial interaction with customers or co-workers due to his irritability and depression. (Tr.

50). Further, in determining the severity of plaintiff's mental disability, the ALJ correctly used the four-step test set forth in 20 C.F.R. 12.00C. (Tr. 16). This test, commonly referred to as the "Paragraph B" criteria, was correctly applied by the ALJ in determining that plaintiff's mental disorder was not severe. Id. Specifically, plaintiff is able to care for himself and perform all the tasks of daily living, has only mild limitations in social functioning and a demonstrated history of steady employment without interaction problems, is able to concentrate and focus well enough to drive a car and grocery shop, performed well in cognitive testing and has experienced no episodes of decompensation of extended duration or requiring hospitalization. Id. Further, the ALJ correctly discounted Dr. Dempsey's statement that plaintiff "does not appear to be someone who would handle vocational stress well at this time," based on later reports from Dr. Dempsey showing improvement in plaintiff's GAF[5] scores and social functioning. (Tr. 290-93). In summary, plaintiff's contention that the ALJ failed to take into account his mental disorders is contradicted by the social interaction limitations he incorporated into his vocational expert hypothetical, and the ALJ's conclusions with respect to plaintiff's mental impairments is substantially supported by evidence in the record.

## VI. Conclusion

---

[5]GAF scores of 31-40 indicate "[s]ome impairment in reality testing or "major" impairment in social, occupational, or school functioning; scores of 41 to 50 reflect "serious" difficulties; scores of 51-60 indicate "moderate" difficulties; scores of 61-70 indicate "mild" difficulties. Plaintiff averaged a GAF score of 52.25 during his four most recent sessions compared with an average GAF score of 49.5 for the four sessions prior to the August 5, 2008 opinion letter by Dr. Ramsey. (Tr. 287-95).

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in the brief in support of his complaint [Doc. #17] is **denied**.

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of February, 2011.